IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

GENEVIEVE M. HINKLE and LOUIS )
HINKLE, )
                              )
         Plaintiffs, )
                              )
     v. )           Civ. No. 14-1020-SLR
                              )
CITY OF WILMINGTON, JACQUELINE )
JENKINS, and EARL JETER, )
                              )
         Defendants. )

Victor F. Battaglia, Sr., Esquire of Biggs & Battaglia, Wilmington, Delaware. Counsel for Plaintiff.

David H. Williams, Esquire, James H. McMackin, III, Esquire, and Allyson Britton DiRocco, Esquire of Morris James LLP Wilmington, Delaware. Counsel for Defendant.

**MEMORANDUM OPINION**

Dated: September 7, 2016
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

On August 8, 2014, plaintiffs Genevieve M. Hinkle ("Hinkle") and Louis Hinkle ("Mr. Hinkle") (collectively "plaintiffs") filed the present lawsuit against defendants City of Wilmington (the "City"), Jacqueline D. Jenkins ("Jenkins"), and Earl Jeter ("Jeter") (collectively "defendants"), alleging a number of federal and state causes of action related to the termination of Hinkle's employment with the City on August 14, 2013. (D.I. 1) Plaintiffs filed a first amended complaint on December 5, 2014 and a second amended complaint ("SAC") on April 21, 2015. (D.I. 15, 31) Plaintiffs' motion for leave to file a third amended complaint was denied on March 30, 2016. (D.I. 71) Presently before the court are plaintiffs' motion for partial summary judgment (D.I. 51) and motion to supplement the record on the parties' motions for summary judgment (D.I. 74), as well as, defendants' motion for summary judgment (D.I. 53). The court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

## II. BACKGROUND

### A. The Parties

Hinkle is a 61 year old Caucasian female[1] and a citizen of the State of Delaware residing in New Castle County. Hinkle was the director of risk management and employee benefits in the human resources department of the City from April 2007 to August 2013. Mr. Hinkle is, and at all times pertinent, has been, Hinkle's husband. (D.I. 31 at ¶¶ 3, 18) Jenkins is the director of human resources for the City and was one of

---

[1] At the time of the SAC.

Hinkle's immediate supervisors. She is an African American, approximately ten years younger than Hinkle. (*Id.* at ¶ 4; D.I. 61 at 14) Jeter is the City Auditor. (D.I. 31 at ¶ 5) The City is a political subdivision of the State of Delaware functioning within the limits imposed upon it by a Home Rule Charter. The City employs numerous individuals in various positions to fulfill its obligations and duties as a municipality. (*Id.* at ¶ 6)

### B. Hinkle's Employment

As director of risk management and employee benefits, Hinkle's job responsibilities included "preparing the budget and making recommendations concerning funding; claims' investigation and adjusting; establishing safety and loss control programs; providing statistical data on accidents and claims; and maintaining the claims management program." (*Id.* at ¶ 7) With respect to the check approval process, Hinkle alleges that she and her assistant would send documentation for check requests to the City's department of finance for its approval. After verifying and approving the check, the finance department would send Hinkle an electronic notice through the City's MUNIS software system and Hinkle would electronically release the check. Hinkle alleges that she did not review any documentation after approval by the finance department. Moreover, the established check approval process did not require her to perform an "electronic review" of the documentation for each check request, nor was she trained to use the software which enabled the electronic review. (*Id.* at ¶ 11; D.I. 61 at 5) Hinkle further asserts that, from the time she was hired until the time she was terminated, neither she nor her supervisors were ever trained to use, nor did they use,

2

TCM[2] to electronically review the documentation for each check request until after the fraud came to surface. (D.I. 31 at ¶ 13; D.I. 61 at 9)

Defendants allege that Hinkle was offered training on the MUNIS system and in certain instances declined it. According to defendants, directors of other departments received the training and were aware that they should review invoices and supporting documentation prior to electronically approving check requests. Moreover, defendants allege that reconciliations between the City's two software programs (MUNIS and Riskmaster) were to be conducted approximately every six months.[3] (D.I. 54 at A6, 71-72, 137)

In October 2012, Hinkle imposed disciplinary action on a subordinate African American City employee who was a personal friend of then Mayor-elect Williams's wife. Hinkle alleges that the City's former head of human resources informed her that Mayor-elect Williams told his former chief of staff that Hinkle should stop harassing his wife's friend. (D.I. 31 at ¶ 9; D.I. 54 at A18-22)

## C. Events Leading to Hinkle's Termination

In March 2013, the City Auditor's Office discovered that from at least April 25, 2012 through March 25, 2014, an accounts payable clerk in the City's department of finance had embezzled $33,347.52 in City funds in the form of twenty fraudulently issued checks to settle claims with funds managed by risk management. Hinkle authorized the issuance of nineteen of the twenty fraudulent checks. Hinkle alleges that

---

[2] TCM is the document imaging system in MUNIS.
[3] Riskmaster is a separate software system that the risk management department uses to maintain records of claims. (D.I. 54 at 3) The City Auditor's final report on the thefts (discussed below) notes that no reconciliation was performed for at least 12 months during the time period of the thefts.

3

her only involvement was to electronically confirm that the finance department had reviewed and approved the documentation for the checks and that they could be printed. (D.I. 31 at ¶¶ 14-15; D.I. 54 at A2-A7)

As City Auditor, Jeter led the internal investigation of the fraud and concluded in his final report dated July 11, 2013, that Hinkle (as director of risk management) was grossly negligent in her failure to verify the documentation for the fraudulent checks prior to approving them for payment. Jeter found that Hinkle had not performed the MUNIS and Riskmaster reconciliation process during the eleven month period that the fraud occurred. (D.I. 54 at A5-A6) On August 14, 2013, Jenkins notified Hinkle that she was terminated, effective immediately, as a result of her negligence in approving fraudulent checks and her failure to "manage the City's [c]laim [m]anagement program, including investigating, adjusting, reserving and maintaining accurate records of all claims" and "ensur[ing] internal controls over cash disbursements were in place." (D.I. 54 at A146)

Martha Gimbel ("Gimbel") is the interim acting human resources director and was Hinkle's immediate supervisor. She is Caucasian and "of equivalent age to [Hinkle]." Gimbel also electronically approved of approximately nineteen of the twenty fraudulent check requests. The City sent her a formal letter of reprimand. John D'Amelio ("D'Amelio") is a senior financial analyst and "approximately 20 years younger than Hinkle." He reviewed the request forms and approved each fraudulent check request. The City also sent him a letter of reprimand. (D.I. 31 at ¶¶ 21, 25; D.I. 67 at 4) Shaina Cooper ("Cooper") is the account manager of the finance department and D'Amelio's immediate supervisor. She is African American and "approximately 25 years younger

4

than Hinkle." Cooper was not disciplined. Sam Pratcher ("Pratcher") was the former

director of human resources and another of Hinkle's immediate supervisors. He is

African-American. He approved one of the fraudulent check requests and was not

disciplined. (D.I. 31 at ¶¶ 22-23)

### D. Post-Termination Events

On August 14, 2013, upon receiving the notice of termination, Hinkle's counsel

sent a letter to Jenkins stating that Hinkle "appeals from the City's decision to terminate

her."[4]  On August 27, 2013, City Solicitor, Michael P. Migliore, Esquire ("Migliore")

responded to Hinkle's counsel, stating that he should direct communications to counsel.

On August 27, 2013, Hinkle's counsel replied that the City Ordinance (and Jenkins)

required that the letter be sent to Jenkins and that he would copy Migliore going

forward. On September 3, 2013, Hinkle's counsel wrote to Migliore requesting that he

"take appropriate steps" to restore Hinkle to her position and requesting a response

within five days. On September 4, 2013, Hinkle's counsel wrote again to request a

"second step grievance protest" and referenced City Ordinance § 40-272 (c). On

September 6, 2013, Migliore replied via email acknowledging the formal grievance

request and to set a meeting with Hinkle. The City and Hinkle agreed to a hearing

---

[4] Wilmington City Code § 40-272 outlines the City's grievance and appeal procedures,
stating that the first step is a "meeting with the employee's supervisor within [five]
working days of notification of the employee's grievance," and the second step is a
meeting with the head of the employee's department within five working days of receipt
of the employee's second step grievance, and requires the department head to provide
a written response to the employee within five working days of the meeting. The third
step allows the employee to meet with the director of personnel within five days of
receipt of the third step grievance, and requires the director of personnel to respond to
the employee in writing within five working days of the meeting. If the grievance has not
been resolved to the employee's satisfaction after these three steps, an employee may
file for an appeal to the personnel appeal board as provided in § 40-273.

5

before the City's personnel appeal board ("appeal board"),[5] although Hinkle contended that defendants refused to allow her the mandatory intermediate steps required by the grievance process. (D.I. 31 at ¶¶ 26-28; D.I.54 at A147-59) A two-day hearing was held on October 22, 2013 and January 6, 2014 before the appeal board consisting of three City employees.

In December 2013, Hinkle filed charges of discrimination with the Equal Employment Opportunity Commission ("EEOC") and Delaware Department of Labor (the "DDOL"), and also applied for unemployment benefits. After a hearing on December 31, 2013, the unemployment insurance appeal board ("unemployment board") found that Hinkle had been discharged from her employment without just cause[6] because the City failed "to present evidence that there was a written policy establishing the procedure for [the check approval process]." (D.I. 52 at 3, B131-34) On January 7, 2014, the EEOC notified the City of the charges.[7] (D.I. 61 at 17)

A member of the appeal board testified that Magliore contacted him to ask about the status of the appeal. The appeal board member replied that he could not discuss the matter. He further testified that he was not influenced by the contact. Hinkle alleges that the contact occurred after the EEOC issued its notification and before the appeal board's decision. (D.I. 52 at B100-01; D.I. 61 at 17)

_____

[5] Provided for pursuant to Wilmington City Code § 40-273.

[6] The unemployment board defines just cause as "willful or wanton act or pattern of conduct in violation of the employer's interest, the employee's duties or the employee's expected standard of conduct." *Majaya v. Sojourner's Place*, 2003 WL 21350542, at *4 (Del. Super. June 6, 2003) (citation omitted).

[7] The DDOL issued a "right to sue" notice on November 3, 2014, and the EEOC issued a "right to sue" notice on November 25, 2014. (D.I. 31 at ¶ 2)

On January 14, 2014, the appeal board issued its decision[8] concluding that,

Hinkle had failed to perform the responsibilities of her position as director of risk

management. However, the City's termination of Hinkle

> was unreasonable in light of the lack of evidence showing City employees, including Mrs. Hinkle were informed and/or trained on the TCM camera option . . . . Additionally, the appeal board was not shown any documentation of written procedures that were in place regarding how the approval of payments through the [MUNIS] system included the TCM process, or how the TCM process was originally implemented.

(D.I. 61 at 8-9; D.I. 54 at A223)  The appeal board recommended that Hinkle's

disciplinary action be modified to a five month unpaid suspension and that she be

allowed to return to her previously held position on February 3, 2014.  The appeal board

also found that the City's delay in responding to Hinkle's grievance, as well as the delay

in providing her an opportunity to speak to one of the City's representatives about her

appeal, violated Hinkle's procedural due process rights.  The appeal board stated that

Hinkle contacted the City on August 15, 2015, but the City did not respond for eight

days.  Moreover, Hinkle was not permitted to speak to a City representative until

October 23, 2013, more than two months later.  The appeal board also concluded that

Hinkle's termination did not result from "any political, religious or racial bias or

prejudice."  (D.I. 31 at ¶ 26; D.I. 54 at 5, A223-24)

On January 16, 2014, Hinkle sent an email to Jenkins stating that she would

return to her position on February 3, 2014.  (D.I. 54 at A225)  On January 29, 2014,

Migliore sent a letter to Hinkle's counsel stating that it was contractually obligated to

Hinkle's temporary replacement James Robb ("Robb"), until the end of March 2014.

---

[8] Although the appeal board's decision is redacted from the appendix, certain portions of the decision were presented unredacted in the briefing.

The letter further stated that "without prejudice to the City's right to take the position that it is not obligated to return Hinkle to her former position, the City will place Hinkle on the payroll at her former rate of pay, and begin providing her employee benefits, effective February 3, 2014." Moreover, the letter stated that the EEOC mediation scheduled for February 28, 2014 should "provide the parties an opportunity to discuss a mutually acceptable resolution." (D.I. 52 at B73) Jenkins provided a declaration stating that the City hired Robb who is "approximately [six] years older than Hinkle"[9] in August 2013 to temporarily fill Hinkle's position and perform a major and comprehensive audit of the City's risk management department's procedures and the City's insurance and employee benefit programs. The City also requested that Robb "review concerns about the manner in which Hinkle performed her responsibility which were triggered by the discovery of the fraud . . . as well as other concerns about Hinkle's performance which surfaced during her disciplinary suspension." The City decided not to reinstate Hinkle on February 3, 2014 in order to provide time for Robb to complete the audit and address related procurement issues. The City extended the length of Robb's contract past March 2014, so that he could complete his audit and review. (D.I. 55)

On January 30, 2014, Hinkle's counsel sent an email to the City's private counsel stating that Hinkle opposed the City's decision to postpone her return to work and to "consider this [email] as a grievance and appeal." On February 6, 2014, the City sent a letter stating that Hinkle could not assert a grievance under Wilmington City Code § 40-272 because she was not a City employee; placing Hinkle on payroll with full benefits

---

[9] Hinkle alleged in her second amended complaint that Robb was younger than she. Hinkle, however, does not rebut defendants' answer that Robb is actually older than she. (D.I. 31 at ¶¶ 24, 67; D.I. 32 at ¶ 24)

was "effectively complying with the recommendation of the personnel appeal board;" it was "not appropriate to reinstate [Hinkle] at this time" because her position was "occupied by an employee under contract through March 2014;" and it was "inappropriate to schedule a meeting pursuant to [§] 40-272 to address Hinkle's grievance" during Jenkins' medical leave. The City also stated that the decision could be discussed at the upcoming mediation. (D.I. 52 at B74-76) On April 15, 2014, the City's position vacancy report listed the status of her position as "vacant" and "awaiting requisition" with a vacancy date of August 14, 2013, the date of Hinkle's termination.

### E. Hinkle's Depression

Hinkle alleges that the City's refusal to reinstate her after the appeal board hearing caused her to suffer from depression and post-traumatic stress disorder. On August 21, 2014, the City notified Hinkle that she could return to work in her former capacity on August 25, 2014. Hinkle declined because her physicians advised her that she was medically unable to return to work. The City then requested Hinkle apply for leave under the Family and Medical Leave Act ("FMLA"). During the application process, Hinkle had separate counsel and encountered resistance from the City regarding her paid leave. During the course of proceedings by the Delaware Industrial Accident Board ("IAB"), the City's medical expert, Dr. James Langan ("Dr. Langan"), examined Hinkle. He found that Hinkle had "undergone a serious psychiatric decompensation leading to agitated symptoms of depression, paranoia and disturbances in formal thinking" as a result of the City's "decision to not let her resume her usual work . . . after she was reinstated following an administrative hearing in January 2014." (D.I. 31 at ¶¶ 38-46; D.I. 49 at A14-16, A49-54; D.I. 62 at B147-151)

9

Hinkle alleges that Dr. Langan re-evaluated her in May 2015 at the City's request. While his second opinion acknowledged that her symptoms and condition had not improved or worsened, Dr. Langan found that Hinkle was able to return to some City employment. (D.I. 61 at 11)  On October 7, 2015, the City offered Hinkle the position of program coordinator in the real estate and housing department at a lower salary. Hinkle testified that she did not have the appropriate background for such a position. Hinkle declined the City's offer stating that her physician had not released her to return to work. (D.I. 54 at A230-32; D.I. 52 at 128-30)

### F. Claims

Hinkle alleges racial, gender, and age discrimination against the City pursuant to Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. §§ 2000e et seq., the Delaware Discrimination in Employment Act ("DDEA"), 19 Del. C. §§ 710 et seq., and the Age Discrimination Act ("ADEA"), 29 U.S.C. § 621 et. seq. (counts I, III, and IV); that defendants' actions deprived her of equal rights under the law in violation of 42 U.S.C. §§ 1981 and 1983 and that those acts together constituted a conspiracy in violation of 42 U.S.C. § 1985 (counts II, VI, VII, VIII, and IX); retaliation (count V); and claims of wrongful termination and breach of contract (count X), a wage claim (count XI), intentional infliction of emotional distress (count XII), prima facie tort (count XIII), and loss of consortium (count XIV) under Delaware law. Mr. Hinkle alleges a claim of prima facie tort (count XIII) and loss of consortium (count XIV) under Delaware law. (D.I. 31)

### III. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

10

matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 415 U.S. 475, 586 n. 10 (1986). A party asserting that a fact cannot be—or, alternatively, is—genuinely disputed must be supported either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motions only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 415 U.S. at 587 (internal quotation marks omitted). The Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586-87; *see also Podohnik v. U.S. Postal Service*, 409 F.3d 584, 594 (3d Cir. 2005) (stating party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). Although the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," a factual dispute is genuine where "the

11

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

## IV. DISCUSSION

### A. Title VII Discrimination Claims

#### 1. Standards

Title VII states that it shall be unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). To succeed on a status discrimination claim, a plaintiff must show that an improper consideration was "a motivating factor" for the adverse action. *See e.g., Univ. of Texas Sw. Med. Ctr. v. Nassar*, ___ U.S. ___, 133 S. Ct. 2517, 2534 (2013); 42 U.S.C. § 2000e-2(m). The ADEA prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age[.]" 29 U.S.C. § 623(a). To succeed on an ADEA claim, a plaintiff "must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action." *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 180 (U.S. 2009).

Because there is no direct evidence of discrimination, Hinkle's claims are analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[10] *Fakete v. Aetna, Inc.*, 308 F.3d 335, 340 (3d Cir. 2002). Under the *McDonnell Douglas* framework, plaintiff has the initial burden of establishing a prima facie case of discrimination by demonstrating that:  (1) she is a member of a protected class;[11] (2) she is qualified for the position; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances that give rise to an inference of unlawful discrimination, such as when a similarly situated person not of the protected class is treated differently.[12] *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410-11 (3d Cir. 1999); *Robinson v. City of Philadelphia*, 491 Fed. Appx. 295, 298 (3d Cir. 2012). Plaintiff's "evidentiary burden at [the prima facie] stage is rather modest: it is to demonstrate to the court that plaintiff's factual scenario is compatible with discriminatory intent—i.e., that discrimination could be a reason for the employer's action." This initial burden is not intended to be onerous. *Marzano v. Computer Sci. Corp.*, 91 F.3d 497, 508 (3d Cir. 1996) (emphasis omitted). The question of whether plaintiff has

---

[10] The *McDonnell Douglas* burden shifting framework is inapplicable in employment discrimination cases wherein plaintiff presents "direct evidence" of discrimination. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002).  Direct evidence of discrimination is defined as evidence that is "so revealing of discriminatory animus that it is unnecessary to rely on the burden-shifting framework, under which the burden of proof remains with the plaintiff." *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 269 (3d Cir. 2010) (quoting *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 512 (3d Cir. 1997)).  The burden-shifting framework applies to cases of racial discrimination regardless of plaintiff's race. *Iadimarco v. Runyon*, 190 F.3d 151, 160-61 (3d Cir. 1999).
[11] For age discrimination, that she is over 40.
[12] The elements of a prima facie case may vary depending on the facts and context of the particular situation. *Pivirotto v. Innovative Sys. Inc.*, 191 F.3d 344, 352 (3d Cir. 1999).

13

established a prima face case is a question of law to be determined by the court.
*Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003).

If plaintiff successfully establishes a prima facie case, the burden then shifts "to
the employer to articulate some legitimate, nondiscriminatory reason for the employee's
rejection." If this burden is met, plaintiff must then demonstrate that the defendant's
asserted rationale is pretextual. *McDonnell Douglas*, 411 U.S. at 802-05. To do this,
"plaintiff must point to some evidence, direct or circumstantial, from which a factfinder
could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or
(2) believe that an invidious discriminatory reason was more likely than not a motivating
or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764
(3d Cir. 1994) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)). "[T]o
avoid summary judgment, . . . plaintiff's evidence rebutting the employer's proffered
legitimate reasons must allow a factfinder reasonably to infer that each of the
employer's proffered non-discriminatory reasons was either a post hoc fabrication or
otherwise did not actually motivate the employment action (that is, the proffered reason
is a pretext)." *Harding v. Careerbuilder, LLC*, 168 Fed. Appx. 535, 537 (3d Cir. 2006)
(quoting *Fuentes*, 32 F.3d at 764) (internal citations and other citations omitted).

### 2. Analysis

To compare her treatment to that of employees outside her protected class for
purposes of a Title VII claim, Hinkle must show that she and the comparator employees
are similarly situated in all relevant respects. *See Houston v. Easton Area Sch. Dist.*,
355 Fed. Appx. 651, 654 (3d Cir. 2009) (citation omitted). "[I]n disciplinary cases or in
the context of personnel actions, for example, the relevant factors often include a

14

'showing that the two employees dealt with the same supervisor, were subject to the

same standards, and had engaged in similar conduct without such differentiating or

mitigating circumstances as would distinguish their conduct or the employer's treatment

of them.'" *Id.* at 654 (citation omitted). "Whether a comparator is truly similarly-situated

to the plaintiff is an issue of law." *Moore v. Shinseki*, 487 Fed. Appx. 697, 698 (3d Cir.

2012) (citation omitted).

As to Hinkle's gender discrimination claim, plaintiff alleges that D'Amelio, a senior

financial analyst in the finance department, is a comparator. D'Amelio worked in a

different department, with different job responsibilities, and a different supervisor

(Cooper). Moreover, D'Amelio and Hinkle had different roles in the check approval

process. D'Amelio and Hinkle are not similarly situated and D'Amelio is not a

comparator. Hinkle additionally argues that the only other employee disciplined for her

failure to detect or prevent the fraud was Gimbel. This misstates the record, as

D'Amelio was given a letter of reprimand. Hinkle contends that the fact that the City

replaced her with a male is "dispositive" of the City's gender discrimination against her.

Absent any additional evidence of defendants exhibiting gender discrimination, the court

does not find this evidence compelling. *Cf. Mosca v. Cole*, 217 Fed. Appx. 158, 162 (3d

Cir. 2007) ("Just as 'the race of the selecting officials is not a sufficient circumstance to

establish a prima facie case of discrimination by itself,' . . . the fact that a plaintiff's

replacement is of a different race, without more, is not enough.") (quoting *Iadimarco*,

190 F.3d at 158).

Turning to Hinkle's race discrimination claim, Hinkle states that Cooper (the

account manager of the finance department) and Jenkins (the director of human

15

resources), both African American, were not disciplined. Although Hinkle alleges that

Cooper and Jenkins were "responsible for preventing or detecting the thefts," there is no

record evidence that they were involved with the check approval process related to the

fraudulent checks. Cooper and Jenkins are in different departments with different

supervisors. The court concludes that they are not comparators. Hinkle additionally

argues that Mayor Williams' animosity (conveyed to Hinkle by the City's former head of

human resources) regarding Hinkle's reprimand to an African American subordinate is

sufficient to support an inference of unlawful racial discrimination. Even if true, the

remark alone does not reflect any racially motivated animosity. *See e.g. Baker v. City of

Philadelphia*, 405 Fed. Appx. 599, 602 (3d Cir. 2010) (finding no error with the district

court's conclusion that, at most, plaintiff presented evidence that his supervisor "disliked

him [which was] insufficient to get to a jury absent some basis for concluding that her

animosity was racially based.") (internal quotation marks omitted); *Vasbinder v.

Shinseki*, 2011 WL 1789989, at *7 (W.D. Pa. May 10, 2011) ("Actions taken as a result

of personal animosity do not raise an inference of discrimination.") (citations omitted).

Moreover, that the person responsible for the theft (an African American) was afforded a

pre-termination hearing before being fired does not support an inference of unlawful

racial discrimination.

As to age discrimination, Hinkle identifies Jenkins, D'Amelio, and Cooper as

comparators. For the same reasons discussed above in the gender and race

discrimination analysis, the court concludes that these employees are not similarly

situated to Hinkle. While certainly not dispositive, the fact that Hinkle was replaced by

Robb, who is actually older than Hinkle, weakens Hinkle's claim of age discrimination.

Accordingly, the court finds that Hinkle has not established a prima facie case with respect to her gender, race, and age discrimination claims.

Even if Hinkle had established a prima facie case, the City has proffered a legitimate, non-discriminatory reason for Hinkle's termination, that is, her part in approving the fraudulent checks. Hinkle argues that such justification is not credible in view of the appeal board and unemployment board decisions finding her termination unjust and defendants' version of the check approval process implausible. However, the appeal board specifically stated that Hinkle's termination did not result from "any political, religious or racial bias or prejudice." On the record at bar, Hinkle has not proffered evidence from which a fact finder could reasonably either disbelieve the City's articulated legitimate reason, or believe that an illegal discriminatory reason was more likely than not a motivating or determinative cause of the City's action. *See Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 283 (3d Cir. 2001) (reiterating that "it is not enough for a plaintiff to show that the employer's decision was wrong or mistaken, because the issue is whether the employer acted with discriminatory animus."). Defendants' motion is granted as to counts I, III, and IV.

### B. Retaliation

#### 1. Standard

To establish a prima facie case of retaliation, plaintiff must show: 1) she engaged in a protected activity; 2) after or contemporaneous with engaging in that protected activity, she was subjected to an adverse employment action; 3) the adverse action was "materially adverse;" and 4) there was a causal connection between her protected activity and the adverse employment action. *Hare v. Potter*, 220 Fed. Appx. 120, 128

(3d Cir. 2007) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). "Although timing and ongoing antagonism have often been the basis for the causal link, [Third Circuit] case law clearly has allowed a plaintiff to substantiate a causal connection for purposes of the prima facie case through other types of circumstantial evidence that support the inference." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280-81 (3d Cir. 2000).

An individual is not protected from all retaliation, only from retaliation that produces an injury or harm. *Burlington*, 548 U.S. at 67. Hence, "plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (citations and internal quotation marks omitted). The court looks to material adversity because "it is important to separate significant from trivial harms." *Id.* "[P]etty slights, minor annoyances, and simple lack of good manners" are not normally sufficient to deter a reasonable person. *Id.* If the plaintiff proves a prima facie retaliation claim, the *McDonnell Douglas* burden-shifting analysis described above applies. *Hare*, 220 Fed. Appx. at 127.

### 2. Analysis

Hinkle contends two adverse events – the City intentionally refused to reinstate her after the appeal board's decision, and the City did not allow her to grieve such refusal.[13] The crux of the City's response is that Hinkle was placed on paid leave with benefits, therefore, she did not suffer an adverse event. Although the Third Circuit has

---

[13] Plaintiff's answering brief refers to the City's refusal to allow her to grieve the failure to reinstate. Defendants' briefing addresses Hinkle's grievance of her termination. (D.I. 54 at 13-14; D.I. 67 at 8)

18

"agree[d] with [its] sister courts that a suspension with pay, 'without more,' is not an adverse employment action under the substantive provision of Title VII," it has not decided the issue in the retaliation context. *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 326, 330 (3d Cir. 2015) (citing and analyzing cases; finding under the specific circumstances that defendant's suspension of plaintiff "with pay was not actionable retaliation, however, because [plaintiff] has identified no evidence showing that her alleged informal complaints caused [defendant] to suspend her"); *Juarez v. Utah*, 263 F. App'x 726, 737 (10th Cir. 2008) (affirming the district court's finding that certain actions including placing plaintiff on paid administrative leave "would not constitute material adverse actions to a reasonable employee in the context of the competing sexual-harassment complaints under investigation"); *Nichols v. S. Illinois Univ.-Edwardsville*, 510 F.3d 772, 787 (7th Cir. 2007) ("We agree with our sister circuits, and find that the Department's placement of [plaintiff] on paid administrative leave pending the results of his fitness-for-duty psychological examinations did not constitute a materially adverse action."); *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 596 (6th Cir. 2007) (stating that the "more liberal definition [articulated in *Burlington Northern*] permits actions not materially adverse for purposes of an anti-discrimination claim to qualify as such in the retaliation context" and finding that plaintiff's "brief placement on paid administrative leave and the 90-day performance plan, appear to meet this relatively low bar," but concluding that defendant "has shown legitimate, nonretaliatory reasons for its actions, which [plaintiff] has been unable to rebut"); *see also Killen v. Nw. Human Servs., Inc.*, 2007 WL 2684541, at *7 (E.D. Pa. Sept. 7, 2007) (finding "that the threat of placement on administrative leave and the threat of a formal audit could have dissuaded

19

a reasonable employee from making a discrimination claim," but plaintiff failed to show

causation and defendant offered a legitimate reason for its actions.).

At bar, Hinkle was not placed on paid leave pending an investigation or for a

specific period of time. Instead, the City refused to reinstate her after the appeal board

ordered it to do so. Moreover, the period of paid leave was left open-ended. The City

contends that the reason for the paid leave was that her position was filled by a

temporary employee, Robb, under contract until March 2016. Jenkins' declaration,

however, stated that the City was investigating Hinkle as to the circumstances

surrounding the check approval process and other non-related issues.

As to causation, the Third Circuit has explained that:

> We consider "a broad array of evidence" in determining whether a
> sufficient causal link exists to survive a motion for summary judgment.
> *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 284 (3d Cir. 2000).
> Where the temporal proximity between the protected activity and the
> adverse action is "unusually suggestive," it is sufficient standing alone to
> create an inference of causality and defeat summary judgment. *See Clark
> County School Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (temporal
> proximity alone, when "very close," can in some instances establish a
> prima facie case of retaliation); *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d
> Cir. 1989) (reversing summary judgment in favor of the defendant where
> plaintiff had been discharged two days after his employer's receipt of his
> EEOC claim). Where the temporal proximity is not "unusually suggestive,"
> we ask whether "the proffered evidence, looked at as a whole, may suffice
> to raise the inference." *Farrell*, 206 F.3d at 280 (internal citation and
> quotation marks omitted). Among the kinds of evidence that a plaintiff can
> proffer are intervening antagonism or retaliatory animus, inconsistencies in
> the employer's articulated reasons for terminating the employee, or any
> other evidence in the record sufficient to support the inference of
> retaliatory animus. *Id.* at 279-81. *See also Anderson v. Liberty Lobby,
> Inc.*, 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of
> evidence in support of the plaintiff's position will be insufficient; there must
> be evidence on which the jury could reasonably find for the plaintiff.").

*LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007).

The record demonstrates that Hinkle filed EEOC charges in December 2013; the EEOC issued a notification of charges to the City on January 7, 2014; the appeal board's decision issued January 14, 2014; and, on January 29, 2014, Migliore told Hinkle not to return to work on February 3, 2014 (as ordered by the appeal board), a decision which could be discussed at the EEOC mediation scheduled for February 28, 2014. Hinkle was not permitted to grieve the decision. Instead, the City informed her that she was not a City employee;[14] the City was effectively complying with the appeal board's decision; and Jenkins was on medical leave. The City offers Robb's contract and the conclusion of his audit as a legitimate reason for delaying Hinkle's reinstatement until August 2014.

The court concludes that Hinkle has raised genuine issues of material fact regarding the City's motives for delaying her reinstatement, particularly for the open-ended nature of the delay. The issue of retaliation is better left to a jury.[15] Defendants' motion is denied in this regard.

## C. Due Process

### 1. Liability

---

[14] The court notes the City's inconsistent contentions with respect to Hinkle's status as an employee. According to the City, she was **not** an employee for purposes of the retaliation claim, but **was** an employee for purposes of the wrongful termination claim.
[15] In opposing the City's motion for summary judgment, Hinkle argues that the City's decision not to reinstate her caused her depression and resulting medical inability to work, thereby resulting in her constructive discharge. (D.I. 61 at 16) Constructive discharge "occurs when an 'employer knowingly permit[s] conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign.'" *Spencer v. Wal–Mart Stores, Inc.*, 469 F.3d 311, 316 n. 4 (3d Cir. 2006) (quoting *Goss v. Exxon Office Sys. Co.*, 747 F.2d 885, 887 (3d Cir. 1984)). As neither party moves for summary judgment on the issue or effectively argues it, the court declines to address it herein.

"To establish liability under 42 U.S.C. § 1983, a plaintiff must show that the defendants, acting under color of law, violated the plaintiff's federal constitutional or statutory rights, and thereby caused the complained of injury." *Biliski v. Red Clay Conso. Sch. Dist. Bd. of Educ.*, 574 F.3d 214, 219 (3d Cir. 2009) (quoting *Elmore v. Cleary*, 399 F.3d 279, 281 (3d Cir. 2005)).  To establish a procedural due process claim, plaintiff must demonstrate that "(1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of life, liberty, or property, and (2) the procedures available to him did not provide due process of law." *Biliski*, 574 F.3d at 219 (internal quotation marks and citations omitted).

Generally, a pre-termination hearing "need not be elaborate." *Cleveland Bd. Of Educ. v. Loudermill*, 470 U.S. 532, 545 (1985).  "Where adequate post-termination procedures are available, an employee is entitled only to 'notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story.'" *Schmidt v. Creedon*, 639 F.3d 587, 596 (3d Cir. 2011) (citing *Loudermill*, 470 U.S. at 545).  The pre-termination hearing "need not definitively resolve the propriety" of the termination.  *Loudermill*, 470 U.S. at 545.  "It should be an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." *Id.* at 545-46.

Hinkle alleges that the City's failure to provide any pre-termination process violated her due process.[16]  Defendants allege (and Hinkle does not contest) that Hinkle was interviewed regarding the fraud during the course of Jeter's investigation and that

---

[16] The parties do not appear to dispute that Hinkle had a property interest in her job.

22

such investigation was tantamount to a pre-termination process.  However, Hinkle

alleges that she was not provided notice of the charges or evidence against her and had

no knowledge that she could be discharged.  While the facts bear out that Jeter

conducted an investigation and interviewed Hinkle and others, there remains a question

of material fact regarding whether such investigation meets the requirements of pre-

termination notice.[17]  Specifically, neither party adequately addresses (other than

through conclusory statements) whether any notice of the charges and evidence was

provided to Hinkle.  Moreover, the appeal board's decision found that the investigation's

conclusion regarding the check approval procedure was in error.  This casts doubt on

whether such investigation could have served as a pre-termination process.  *Schmidt v.*

*Creedon*, 639 F.3d 587, 598 (3d Cir. 2011) (absent extraordinary circumstances, some

form of pre-deprivation proceeding is necessary before suspending an employee from a

position in which he had a property interest, even if constitutionally adequate post-

deprivation proceedings are available).  The parties' motions are denied in this regard.[18]

Hinkle also argues that defendants' subsequent refusal to abide by the appeal

board's decision and reinstate her also violated her due process.  Defendants respond

that Hinkle's placement on paid leave is sufficient to alleviate due process concerns.

*See generally Loudermill*, 470 U.S. at 545-546 (stating that employers may avoid due

---

[17] As noted above, the person responsible for the theft was afforded a pre-termination hearing before being fired.

[18] The court declines to find that plaintiffs waived this argument.  The SAC sets forth the factual information regarding the investigation and Hinkle's termination.  The SAC generally alleges that Jenkins, Jeter, and the City deprived Hinkle of her employment, including but not limited to the refusal to comply with the City's grievance process.  It also alleges that the "suspension and/or actual or constructive termination of [Hinkle's] employment, the intentional violations of the Grievance Process, and the refusal to reinstate" violated Hinkle's rights.  (D.I. 31 at ¶¶ 75-93)

process concerns in cases in which immediate suspension of an employee is necessary by placing that employee on paid, rather than unpaid, leave); *Edwards v. California Univ.*, 156 F.3d 488, 492 (3d Cir. 1998) (noting that placement of tenured professor on paid leave did not implicate due process concerns). The court concludes that Hinkle's post-termination due process rights were not violated.[19] Defendants' motion is granted and plaintiffs' motion is denied in this regard.

## 2. Qualified immunity

Defendants argue that Jenkins and Jeter are immune from liability under the doctrine of official or qualified immunity. Government officials performing discretionary functions are immune from liability for civil damages when their conduct does "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted). A right is "clearly established" when "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *accord In re City of Phila. Litig.*, 49 F.3d 945, 961 (3d Cir. 1995).

When analyzing a qualified immunity defense, the court must first ascertain "whether plaintiff has [alleged] a violation of a constitutional right at all." *Larsen v. Senate of the Commonwealth of Pa.*, 154 F.3d 82, 86 (3d Cir. 1998). Next, the court must inquire whether the right was "'clearly established' at the time the defendants

---

[19] Defendants moved for summary judgment that Hinkle was afforded due process as to the grievance process post-termination. (D.I. 54 at 14-16) Plaintiffs state that they "are not suggesting [that] the City's failure to abide by the Code's multi-step Grievance Procedure violated [Hinkle's] Constitutional rights." (D.I. 64 at 7) The court, therefore, denies defendants' motion as moot in this regard.

24

acted." *In re City of Phila., Litig.*, 49 F.3d at 961 (quoting *Acierno v. Cloutier*, 40 F.3d 597, 606 (3d Cir. 1994)). Finally, the court must determine whether "'a reasonable person in the official's position would have known that his conduct would violate that right.'" *Open Inns, Ltd. v. Chester County Sheriff's Dep't*, 24 F. Supp. 2d 410, 419 (E.D.Pa. 1998) (quoting *Wilkinson v. Bensalem Township*, 822 F. Supp. 1154, 1157 (E.D.Pa. 1993) (citations omitted)). If, on an objective basis, "'it is obvious that no reasonably competent [official] would have concluded that [the actions were lawful],'" defendants are not immune from suit; however, "'if [officials] of reasonable competence could disagree on this issue, immunity should be recognized.'" *In re City of Phila. Litig.*, 49 F.3d at 961-62 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Defendants argue that Hinkle has not asserted a constitutional violation, and "even if Jenkins and Jeter violated Hinkle's federal constitution or statutory rights in some discretionary function they performed, they are immune from personal liability." (D.I. 57 at 15-16) As discussed above, there exists an issue of material fact at least as to the due process concerns regarding the pre-termination process. The parties' motions are denied in this regard.

### E. Wrongful Termination

In the SAC, Hinkle alleges a count of wrongful termination/breach of contract as follows. City employees should only be terminated for just cause as a matter of public policy. The City's failure to follow the grievance process after Hinkle's actual or constructive termination constituted a violation of such public policy. Defendants have fabricated false justifications for Hinkle's actual or constructive termination. These violations constitute violations of the covenant of good faith and fair dealing contained in

25

every employment agreement in Delaware and, therefore, amount to wrongful

termination and breach of contract.  (D.I. 31 at ¶¶ 99-104)

> Actionable claims for breach of the covenant of good faith and fair dealing
> fall into four categories: (i) where the termination violated public policy; (ii)
> where the employer misrepresented an important fact and the employee
> relied "thereon either to accept a new position or remain in a present one;"
> (iii) where the employer used its superior bargaining power to deprive an
> employee of clearly identifiable compensation related to the employee's
> past service; and (iv) where the employer falsified or manipulated
> employment records to create fictitious grounds for termination.

*Lord v. Souder*, 748 A.2d 393, 400 (Del. 2000) (citation omitted).  "[U]nder the public

policy category: (i) the employee must assert a public interest recognized by some

legislative, administrative or judicial authority and (ii) the employee must occupy a

position with responsibility for advancing or sustaining that particular interest." *Id.* at

401 (citations omitted).

The parties advance competing motions regarding the breach of the covenant of

good faith and fair dealing.  Hinkle appears to contend that the City's refusal to follow

the multi-step grievance procedure and the City's refusal to allow her to grieve the

denial of her reinstatement (instead being placed on paid leave) violated the covenant

of good faith and fair dealing.  Defendants disagree and argue that as to the paid leave,

Hinkle's claim fails because her employment was not terminated.  Moreover, Hinkle fails

to demonstrate that she has asserted a public interest or occupied a position with

responsibility for advancing or sustaining such interest.

At bar, the City did not follow the multi-step grievance process.  Moreover it

articulated inconsistent positions regarding Hinkle' employment, i.e., on one hand

arguing that she was not a City employee and could not grieve her reinstatement, and

26

on the other that she was not "terminated" when she was placed on paid leave. Given

these open questions of material fact, the parties' motions are denied in this regard.

### F. Conspiracy to Violate Civil Rights

Section 1985(3) permits an action to be brought by one injured by a conspiracy

formed "for the purpose of depriving, either directly or indirectly, any person or class of

persons of the equal protection of the laws, or of equal privileges and immunities under

the laws." 42 U.S.C. § 1985(3). Plaintiff must allege:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or
> indirectly, any person or class of persons of the equal protection of the
> laws, or of equal privileges and immunities under the laws; and (3) an act
> in furtherance of the conspiracy; (4) whereby a person is injured in his
> person or property or deprived of any right or privilege of a citizen of the
> United States.

*Farber v. City of Paterson*, 440 F.3d 131, 134 (3d Cir. 2006) (citing *United Bhd. of*

*Carpenters & Joiners v. Scott*, 463 U.S. 825, 828-29 (1983)). "[A] conspiracy claim

[under § 1985] requires a clear showing of invidious, purposeful and intentional

discrimination between classes or individuals" and "must involve more than one state or

private agency." *Carter v. Delaware State Univ.*, 65 F. App'x 397, 400 (3d Cir. 2003)

(citation omitted). At bar, the conspiracy claim fails at least for the reason that Jeter and

Jenkins are both employees of the City, therefore, only one political subdivision of the

State is involved. Defendants' motion is granted in this regard.

### G. Wage Claim

Hinkle alleges in count XI that the City "without any reasonable grounds for

dispute, failed and refused to pay [her] wages and benefits as required by Chapter 11 of

Title 19 of the Delaware Code." (D.I. 31 at ¶¶ 105-107) Chapter 11 of Title 19 of the

Delaware Code states that it "does not apply to employees of the United States

27

government, the State of Delaware or any political subdivision thereof." Del. C. 19, §

1101. As the City is a political subdivision of the State of Delaware, the court grants

defendants' motion in this regard.

### H. Motion to Supplement

The court analyses whether "the proposed supplementary information . . .

provide[s] any new evidence or create[s] any new questions of material fact that impact

ruling on the pending" motion for summary judgment. *Jackson v. Ivens*, 2010 WL

2802279, at *1 (D. Del. July 13, 2010) (citing *Edwards v. Pa. Tpk. Comm'n*, 80 Fed.

Appx. 261, 265 (3d Cir. 2003)). At bar, plaintiffs seek to supplement the record with a

March 22, 2016 letter wherein the City withdrew its petition to terminate benefits paid to

Hinkle and the earlier filed petition to terminate. Plaintiffs state that the supplements are

relevant to Hinkle's claim that there is no dispute her employment related disability

continues. This information does not alter the decision rendered herein, therefore,

plaintiffs' motion is denied.

### V. CONCLUSION

For the aforementioned reasons, defendants' motion for summary judgment (D.I.

53) is granted in part and denied in part.[20] Plaintiff's motion for partial summary

judgment (D.I. 51) and motion to supplement the record (D.I. 74) are denied. An

appropriate order shall issue.

---

[20] Defendants state that the partial motion to dismiss the original complaint (D.I. 17) filed on December 19, 2014 is pending and "incorporate by reference the arguments set forth in their partial motion to dismiss and supporting papers." (D.I. 54 at 1, 7) The court is unclear on what defendants seek to accomplish as two amended complaints were filed on December 5, 2014 and April 21, 2015. (D.I. 15; D.I. 31)

28